ORIGINAL

FILED
NOV 16 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RALPH FRANKLIN & SON LOGGING,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 04-1679C

**COMPLAINT**

ALLEGATIONS COMMON TO ALL COUNTS

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609.

2. Plaintiff is Ralph Franklin & Son Logging ("Franklin"), a California partnership.

3. Ralph G. Franklin ("R.G. Franklin"), also known as Gary Franklin, was at all relevant times the managing partner of Franklin.

4. Defendant is the United States of America acting through the United States Forest Service, Department of Agriculture (the "Forest Service").

5. This action arises out of the Forest Service's denial of certified claims that Franklin submitted to the Contracting Officer under the Contract Disputes Act (CDA), 41 U.S.C. § 601, *et. seq.*, for breach of four Small Log Biomass sale contracts (collectively, the "Franklin contracts"): Dow Butte Small Log Biomass Sale, Contract No. 059955 ("Dow Butte") awarded August 9, 1999; Signal Thin DFPZ Small Log Biomass Sale, Contract No. 060169 ("Signal Thin") awarded September 28, 2000; Little Ant Small Log Biomass Sale, Contract No. 059930 ("Little Ant") awarded July 12, 1999; and Summit DFPZ Small Log Biomass Sale, Contract No. 58060110 ("Summit") awarded July 20, 2000.

6. The Franklin contracts were for the sale and harvest of certain small log biomass (hereinafter "biomass") located in specified areas of the Lassen National Forest in California.

7. Biomass is:

> Wood product obtained (usually) from in-woods chipping of all or some portion of trees, including limbs, tops, and unmerchantable stems, usually for energy production.

The Dictionary of Forestry, Society of American Forests (1998).

8. At all times relevant to this action, Franklin was in the business of harvesting biomass, converting that material into chips, and then selling the chips as fuel for the production of electricity.

9. For several years prior to entering into the four contracts which have given rise to this litigation Franklin routinely entered into biomass contracts with the Forest Service, including biomass contracts on the Eagle Lake District of the Lassen National Forest.

10. Franklin routinely operated Lassen National Forest biomass contracts during the winter.

11. Because Franklin and the Forest Service had previously entered into a number of biomass contracts, at the time of the award of each of the Franklin contracts the Forest Service was aware of the nature of Franklin's business, including the end use to which Franklin put the biomass that Franklin purchased from the Forest Service.

12. When Franklin entered into each of the Franklin contracts with the Forest Service, it reasonably anticipated being able to operate the sales and harvest the biomass from each sale area during the winter, including December 2000 through January 2001. Prior to December 11, 2000 the Forest Service was fully aware that Franklin intended to operate each sale and harvest the biomass during the winter.

13. The normal operating season specified in each Franklin contract was from June into October. The biomass encompassed by each contract was located in areas that normally permit winter sale operations outside of the normal operating season.

14. Weather and ground conditions on the Dow Butte sale area would not have precluded operations on the sale, including shearing, skidding, chipping and hauling of biomass fuel, for any significant portion of the time period December 11, 2000 through January 7, 2001.

15. Weather and ground conditions on the Signal Thin sale area would not have precluded operations on the sale, including shearing, skidding, chipping and hauling of biomass fuel, for any significant portion of the time period December 11, 2000 though January 7, 2001.

16. Weather and ground conditions on the Little Ant sale area would not have precluded operations on the sale, including shearing, skidding, chipping and hauling of biomass fuel, for any significant portion of the time period December 11, 2000 through January 7, 2001.

17. Weather and ground conditions on the Summit sale area would not have precluded operations on the sale, including shearing, skidding, chipping and hauling of biomass fuel, for any significant portion of the time period December 11, 2000 through January 7, 2001.

18. Prior to December 11, 2000 Franklin informed the Forest Service that it desired to conduct winter operations, including shearing, skidding, chipping and hauling on each of the Franklin contracts, beginning in December 2000 as soon as possible.

19. The Forest Service granted Franklin's request to operate the Dow Butte and Signal Thin contracts in December 2000 but denied Franklin's request to operate the Little Ant and Summit contracts in December 2000.

20. At no time did the Forest Service inform Franklin that the winter operations requested by Franklin would not be permitted because of weather conditions on either the Little Ant or Summit contracts.

21. Weather and ground conditions were adequate for winter operations, including shearing, skidding, chipping and hauling, on each of the Franklin contracts from December 11, 2000 through January 7, 2001.

22. Beginning at the latest in November 2000 and continuing at least until early January 2001, the electricity market in California experienced a severe shortage of supply, resulting in high electricity prices and correspondingly high prices for biomass fuel used by electric power generating companies for producing electricity.

23. The Forest Service suspended harvest operations on the Dow Butte and Signal Thin contracts, effective December 11, 2000, except for the removal of down material and certain winterization activities.

24. Prior to the Forest Service's refusal to allow Franklin to operate the Little Ant and Summit contracts in December 2000, the Forest Service was aware of the severe shortage of supply in the California electricity market and that the prices paid by electric power generating companies for biomass fuel, including Franklin's customers, had greatly increased.

25. Prior to the December 11, 2000 suspension of the Dow Butte and Signal Thin contracts, the Forest Service was aware of the severe shortage of supply in the California electricity market and that the prices paid by electric power generating companies for biomass fuel, including Franklin's customers, had greatly increased.

26. Because of the significant increase in electricity prices, Franklin anticipated in November 2000 that it could realize a substantial increase in net revenue through the selling of biomass fuel to power generating companies.

27. Because Franklin anticipated a significant rise in the price of biomass fuel in November 2000, Franklin entered into contracts with two power generating companies, Wheelabrator Shasta Energy Co., Inc. ("Wheelabrator") and Honey Lake Power Co.

("Honey Lake"), under which Franklin agreed to sell biomass fuel to Wheelabrator and Honey Lake from the Franklin contracts at prices that would increase as the price of electricity in California increased.

28. Franklin relied upon the Franklin contracts with the Forest Service to provide the biomass fuel it planned on delivering to Wheelabrator and Honey Lake.

29. Because the Forest Service was aware that the nature of Franklin's business was to sell biomass fuel to California electricity producers, and because the California energy crisis was a well-publicized and well-known fact at least by late November 2000, the Forest Service knew or should have known that Franklin stood to incur significant lost revenue if Franklin was unable to harvest the biomass on the Franklin contracts during the period December 11, 2000 through January 7, 2001.

30. In October 2000, the Earth Island Institute and other environmental activist groups (collectively "Earth Island") filed a lawsuit against the Forest Service in the United States District Court for the Northern District of California which was docketed as case no. CIV-S-00-2257 WBS/DAD (the "environmental litigation").

31. In the environmental litigation, Earth Island alleged that since 1995 the Forest Service had violated the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA") when, among other things, the Forest Service allowed

timber harvesting within the Sierra Nevada National Forests, including from the Lassen National Forest, in areas containing suitable habitat for the Pacific fisher and the California spotted owl before the Forest Service completed a valid region-wide management plan for the protection of those species.

32. As part of its lawsuit, Earth Island requested that the district court enter a preliminary injunction against the Forest Service that would prohibit the Forest Service from allowing any further timber harvesting in areas containing habitat suitable for the Pacific fisher and California spotted owl until the Forest Service completed the appropriate environmental analysis and implemented a valid management plan.

33. At all times relevant to this case, Assistant United States Attorney Edmund F. Brennan ("Mr. Brennan") served as attorney of record for the United States in the environmental litigation.

34. Despite publicly stating in an interview reported in the Sacramento Bee newspaper that he doubted the viability of Earth Island's claims in the environmental litigation, Mr. Brennan agreed with Earth Island to have the Forest Service voluntarily suspend virtually all timber and biomass cutting and shearing in all Sierra Nevada National Forests, including the Franklin contracts on the Lassen National Forest.

35. In November 2000 the Forest Service and Earth Island entered into a negotiated agreement to effectuate suspension of all timber and biomass cutting and shearing in all Sierra Nevada National Forests (the "negotiated agreement").

36. Under the terms of the negotiated agreement Earth Island agreed to suspend the district court proceedings on its pending request for a preliminary injunction.

37. In return for Earth Island's commitment under the negotiated agreement to suspend proceedings on its pending request for a preliminary injunction, the Forest Service suspended virtually all timber and biomass harvesting operations in all Sierra Nevada National Forests, including the Franklin contracts on the Lassen National Forest, for a period of at least 30 days beginning at midnight on December 10, 2000.

38. In its court filings, Earth Island specified several timber sales as examples of sales in the Sierra Nevada National Forests that violated NEPA and NFMA with respect to Pacific fisher and California spotted owl habitat, but <u>none</u> of those sales included the Franklin contracts.

39. None of the Franklin contracts involved harvesting timber or biomass within Pacific fisher or California spotted owl habitat.

40. R.G. Franklin sent a letter dated December 4, 2000 to Christopher Click, the Forest Service's Contracting Officer for the Franklin contracts. In the December 4 Letter, R.G. Franklin informed the Contracting Officer that Franklin was expecting to harvest biomass in accordance with the Franklin contracts in order to satisfy Franklin's obligations to power generating companies, stating:

> These federal contracts are the only source of raw material that my company has to fulfill our contractual obligation with wood fired power plants and others. Your negotiated settlement will not only financially ruin my company but also ruin my commitment credibility for future contractual engagements.

41. R.G. Franklin sent a letter dated December 5, 2000 to Mr. Brennan, as well as to Brad Powell, the Forest Service's Regional Forester, in which R.G. Franklin stated that Franklin's contracts would <u>not</u> endanger Pacific fisher or California spotted owl habitat. In the December 5 Letter, R.G. Franklin, wrote:

> [the Government's] negotiated . . . suspension [concerning the environmental litigation] will cost [Franklin] over 15 million dollars and over twice that amount to the [] wood fired power plants that rely on [Franklin's] shipments for fuel. In addition, [the Government's] negotiated suspension will exacerbate the current shortage of electrical power generation in the state of California and cause our citizens more soical [sic] and economic hardship.

42. In a memorandum dated December 7, 2000, the Regional Forester directed all Sierra Nevada Forest Supervisors "to request that timber sale contract Purchaser's [sic] voluntarily suspend any operations they have currently on-going or planned for the period December 11, 2000 to March 1, 2001." In the December 7 memorandum, the Regional Forester instructed each Forest Supervisor that if purchasers did not voluntarily agree to

suspend their operations, "your Timber Sale Contracting Officer or yourself are to order their falling operations to be suspended effective midnight Sunday, December 10, 2000."

43. On December 8, 2000, the Contracting Officer sent a letter to Franklin asking Franklin to cease its biomass harvesting activities voluntarily under the Franklin contracts with the exception of removing material already felled and conducting winterization activities.

44. R.G. Franklin responded to the Contracting Officer's December 8, 2000 letter with a handwritten fax that same day stating that Franklin would not voluntarily cease its operations under the Franklin contracts.

45. The Forest Service then informed Franklin in a letter dated December 8, 2000 from Edward D. Cole, Forest Supervisor for the Lassen National Forest, that the Forest Service was unilaterally "order[ing Franklin] to suspend any active or planned operations on the Lassen National Forest for the period December 11, 2000, to March 1, 2001."

46. Despite having been put on actual notice that Franklin's harvesting operations, including shearing, skidding and chipping, would not adversely affect Pacific fisher or California spotted owl habitat; that suspending Franklin's harvesting operations would result in massive financial losses to Franklin; that Franklin was expecting to use the biomass it harvested under the contracts to satisfy Franklin's contractual obligations to Wheelabrator and Honey Lake; and despite Franklin's express refusal to suspend its

harvesting operations voluntarily, the Forest Service unilaterally suspended the Franklin contracts and precluded Franklin from continuing or commencing harvesting activities under the Franklin contracts except for the removal of biomass already cut or sheared and certain winterization activities.

47. At no time did the Forest Service identify any provision of any of the Franklin contracts that would permit it unilaterally to suspend or curtail Franklin from exercising its rights to harvest biomass under those contracts.

48. No provision in the Franklin contracts, including clause C6.01, authorized the Forest Service to suspend Franklin's operations.

49. On March 6, 2001, in the environmental litigation the district court denied Earth Island's renewed motion for a preliminary injunction suspending Franklin's contracts and all other timber sales in the Sierra Nevada National Forests of California and, among other findings and rulings in the government's favor, the Court ruled:

> The record in this matter does not support plaintiffs' assertion that these timber sales will remove or substantially degrade the habitat of the owl and the fisher, compromising their viability.

Slip op. at 23.

50. The March 6, 2001 ruling of the United States District Court was subsequently affirmed by the United States Court of Appeals for the Ninth Circuit, No. 01-15501.

51. After the Court of Appeals decision, Earth Island never sought a trial or further hearing on the merits of its claims or requested any further injunctive relief in the environmental litigation.

52. At no time from the inception of the environmental litigation to date has the Forest Service ever claimed that it precluded harvest of the timber and biomass material from the Franklin contracts from December 11, 2000 through January 7, 2001 in order to prevent unacceptable environmental impacts, including unacceptable degradation of the habitat of the California spotted owl or Pacific fisher.

53. At all times in the environmental litigation the attorneys representing the United States and the Forest Service consistently claimed that none of the Forest Service timber or biomass contracts that Earth Island sought to enjoin, including the Franklin contracts, would cause any unacceptable environmental impacts, including unacceptable degradation of habitat for the California spotted owl or the Pacific fisher.

54. In letters dated March 24, 2004 received by the Contracting Officer on March 26, 2004, Franklin submitted claims under the CDA for the damages incurred by Franklin and its subcontractor Del Logging due to the Forest Service's breach of the Franklin contracts. In its claim letters, Franklin expressly requested contracting officer's final decisions if the contracting officer denied Franklin's claims in whole or in part.

55. By letters dated September 24, 2004 received by Franklin on September 29, 2004, the Contracting Officer responded to Franklin's CDA claims. The Forest Service's Contracting Officer denied Franklin's claims in their entirety with respect to the Little Ant and Summit contracts.

56. In the Contracting Officer's September 24, 2004 letter responding to Franklin's CDA claim under the Dow Butte contract, the Contracting Officer stated "I could deny the claim in its entirety. However, I recognize that the suspension had an impact on some of Franklin's operations." The Contracting Officer nevertheless denied Franklin's CDA claim under the Dow Butte contract in its entirety.

57. In the Contracting Officer's September 24, 2004 letter responding to Franklin's CDA claim under the Signal Thin contract, the Contracting Officer stated "I could deny the claim in its entirety. However, I recognize that the suspension had an impact on some of Franklin's operations." The Contracting Officer nevertheless denied Franklin's CDA claim under the Signal Thin contract in its entirety.

58. Prior to issuing his final decision denying each of Franklins' claims, the Contracting Officer never asked Franklin for any additional information or documentation supporting any aspect of its claims, despite the invitation to the Contracting Officer to do so, if necessary, in each of Franklin's CDA claim letters.

59. As a matter of law under the CDA the Contracting Officer is required to evaluate Franklin's claims impartially and to grant Franklin's claims for whatever amount the Contracting Officer in good faith believes the government is liable. The Contracting Officer's obligation in this regard is confirmed by the Forest Service's Timber Sale Administration Handbook which directs contracting officers as follows:

> The Contracting Officer's decisions [on a purchaser CDA claim] must meet the following standards
>
> * * *
>
> Impartial. Strive to make an objective, impartial decision based on all the advice and information available.
>
> * * *
>
> The amount determined payable in the Contracting Officer's decision, less any portion already paid, normally should be paid without purchaser action on an appeal. Make such payment without prejudice to the rights of either party.

FSH 2409.15, §§ 72.33, 72.33, 72.61.

60. Because the Contracting Officer recognized in his final decisions on Franklin's claims under the Dow Butte and Signal Thin contracts that the Forest Service had caused Franklin to incur damages due to the Forest Service's suspension of the Dow Butte and Signal Thin contracts, the Contracting Officer should have directed that payment of such damages be made forthwith to Franklin.

61. Having failed to do this, the Contracting Officer breached his statutory obligations and his contractual obligations under the Dow Butte and Signal Thin contracts, including the Contracting Officer's obligations of good faith and fair dealing under those contracts.

## COUNT 1

## BREACH OF TIMBER SALE CONTRACT NO. 059955, THE DOW BUTTE CONTRACT

62. Franklin restates paragraphs 1 through 61 above and incorporates those paragraphs as allegations herein.

63. The Forest Service awarded the Dow Butte contract to Franklin on August 9, 1999.

64. Franklin entered into a subcontract with Del Logging on December 5, 2000, under which Del Logging was to assist Franklin in harvesting biomass from the Dow Butte sale area, converting that biomass into chip fuel and delivering that fuel to Wheelabrator and Honey Lake on Franklin's behalf.

65. In reliance on the Dow Butte contract, Franklin and Del Logging moved biomass harvesting equipment into the Dow Butte sale area and made other expenditures in order to conduct their harvesting operations there.

66. From December 11, 2000 though January 7, 2001, the Forest Service unilaterally suspended Franklin's right to conduct biomass harvesting operations under the Dow Butte contract except for removing previously felled biomass and conducting winterization activities.

67. By unilaterally suspending Franklin's biomass harvesting operations under the Dow Butte contract, the Forest Service breached its obligations under the Dow Butte contract.

68. The Forest Service's unilateral suspension of the Dow Butte contract prevented both Franklin and Del Logging from being able to harvest biomass on the Dow Butte sale and to deliver all of the biomass fuel to Wheelabrator and Honey Lake they could have delivered but for the Forest Service's breach of contract.

69. As a direct result of the Forest Service's unwarranted suspension and breach of the Dow Butte contract, Franklin and its subcontractor Del Logging incurred substantial damages, including lost net revenue, unnecessary move-in/move-out expenses and overhead and profit in a combined total of $604,625.85.

## COUNT 2

## BREACH OF TIMBER SALE CONTRACT NO. 060169, THE SIGNAL THIN CONTRACT

70. Franklin restates paragraphs 1 through 61 above and incorporates by reference those paragraphs as allegations herein.

71. The Forest Service awarded the Signal Thin contract to Franklin on September 28, 2000.

72. In reliance on the Signal Thin contract, Franklin moved biomass harvesting equipment into the Signal Thin sale area and made other expenditures in order to conduct its harvesting operations there.

73. From December 11, 2000 though January 7, 2001, the Forest Service unilaterally suspended Franklin's right to conduct biomass harvesting operations under the Signal Thin contract except for removing previously felled biomass and conducting winterization activities.

74. By unilaterally suspending Franklin's biomass harvest operations under the Signal Thin contract, the Forest Service breached its obligations under the Signal Thin contract.

75. As a direct result of the Forest Service's breach of the Signal Thin contract, Franklin was unable to deliver all of the biomass fuel to Wheelabrator and Honey Lake that it could have delivered but for the Forest Service's breach of contract.

76. As a direct result of the Forest Service's unwarranted suspension and breach of the Signal Thin contract, Franklin suffered $866,899.12 in damages, consisting of lost net revenue on the sale of biomass fuel to Wheelabrator and Honey Lake that would have been completed if the Forest Service had not breached the contract and unnecessary additional move-in/move-out expenses.

## COUNT 3

## BREACH OF TIMBER SALE CONTRACT NO. 059930, THE LITTLE ANT CONTRACT

77. Franklin restates paragraphs 1 through 61 above and incorporates by reference those paragraphs as allegations herein.

78. The Forest Service awarded the Little Ant contract to Franklin on July 12, 1999.

79. On or before December 5, 2000 Franklin notified the Forest Service that it desired to commence biomass harvest operations on the Little Ant sale area as soon as possible in December 2000. The Forest Service denied Franklin's request to operate the Little Ant contract during December 2000.

80. From December 11, 2000 though January 7, 2001, the Forest Service unilaterally prevented Franklin from conducting any biomass harvesting operations under the Little Ant contract.

81. By unilaterally precluding Franklin's harvest operations under the Little Ant contract, the Forest Service breached its obligations under the Little Ant contract.

82. As a direct result of the Forest Service's unwarranted preclusion and breach of the Little Ant contract, Franklin was unable to deliver all of the biomass fuel to Wheelabrator and Honey Lake that it could have delivered but for the Forest Service's breach of contract.

83. As a direct result of the Forest Service's unwarranted preclusion and breach of the Little Ant contract, Franklin suffered $239,433.72 in damages, consisting of lost net revenue on the deliveries of biomass fuel to Wheelabrator and Honey Lake that would have occurred if the Forest Service had not breached the contract.

## COUNT 4

## BREACH OF TIMBER SALE CONTRACT NO. 58060110, THE SUMMIT CONTRACT

84. Franklin restates paragraphs 1 through 61 above and incorporates those paragraphs as allegations herein.

85. The Forest Service awarded the Summit contract to Franklin on July 20, 2000.

86. On or before December 5, 2000 Franklin notified the Forest Service that it desired to commence biomass harvest operations on the Summit sale area as soon as possible in December 2000. The Forest Service denied Franklin's request to operate the Summit contract during the suspension period, December 11, 2000 to January 7, 2001.

87. Franklin entered into a subcontract with Del Logging on or about December 5, 2000, whereby Del Logging was to assist Franklin in harvesting timber under the Summit contract, convert that biomass into chip fuel and deliver that fuel to Wheelabrator and Honey Lake on Franklin's behalf.

88. From December 11, 2000 though January 7, 2001, the Forest Service unilaterally prevented Franklin and Del Logging from conducting any biomass harvesting operations under the Summit contract.

89. By unilaterally precluding Franklin's harvesting operations under the Summit contract, the Forest Service breached its obligations under the Summit contract.

90. As a direct result of the Forest Service's unwarranted preclusion and breach of the Summit contract, Franklin and Del Logging were unable to deliver all of the biomass fuel to Wheelabrator and Honey Lake they could have delivered but for the Forest Service's breach of contract.

91. As a direct result of the Forest Service's unwarranted preclusion and breach of the Summit contract, Franklin and its subcontractor, Del Logging, suffered a combined total of $2,176,608.41 in damages, including lost net revenue, overhead and profit.

WHEREFORE, plaintiff respectfully requests that this Court:

(a) overturn the Contracting Officer's denial of Franklin's claims under each of the Franklin contracts;

(b) find that the Forest Service breached each of the Franklin contracts by wrongfully suspending and/or precluding operations under those contracts;

(c) award Franklin all damages it has suffered as a result of the Forest Service's wrongful suspension and/or preclusion of the Franklin contracts, including lost profits, plus applicable interest in accordance with the Contract Disputes Act;

(d) award Franklin its costs and attorneys' fees incurred in pursuing this action; and

(e) grant Franklin such further relief as this Court deems just and proper.

Respectfully submitted,

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Ruth G. Tiger
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: November 16, 2004